Our first case this morning is 2013-1003, ALEXSAM v. PIER 1 IMPORTS. Mr. Maloney. May it please the court. The claims in this case relate to systems and methods for activating gift cards using a retailer's existing point-of-sale equipment. The invention involves encoding the cards with a bin in a standard manner so that the cards could be swiped through the existing terminals and a mount entered and this information sent through a network to a processing hub to activate the cards so they can be used to make purchases. The accused PIER 1 system was first implemented in 2001. PIER 1 contracted with SVS to perform the processing hub steps of the claim. PIER 1 asserted in this trial in the context of invalidity that a Kmart system also implemented using the SVS processing hub was invalidating prior art and the evidence was undisputed that that system was not launched until August of 1997. The experts and the fact witnesses all agreed and established that those two systems were identical in all relevant aspects to these claims. Same bin, same type of equipment, same activation process, same SVS processing hub. Ms. Britsky, PIER 1's technical expert, confirmed all of this at trial. The invalidity defense failed, however, because ALEXSAM through the testimony and corroboration of Mr. Dorff and another witness, Mr. Levinson, proved that his invention was made well prior to the earliest possible invention date of the Kmart system, which was December of 1996. The record was conclusive that Mr. Dorff had conceived of his entire invention well prior to that and that was documented and his testimony was fully corroborated. So the invalidity portion of the verdict is supported by substantial evidence. These patents are valid because the Kmart was not prior art. However, because it was admitted that the Kmart system and the accused PIER 1 system are identical in all relevant respects and that the Kmart system met every element of the claims, it follows inescapably that the PIER 1 accused system meets every limitation of the claims as construed by the court and that's why the non-infringement portion of the verdict must be reversed. Reversal does not require re-weighing the evidence or assessing witness credibility. It only requires this court confirm that reasonable jurors must accept the agreed expert testimony of the competing technical experts regarding the scope of the claims as construed, as understood by persons of skill in the art, the relevant facts regarding the Kmart and accused PIER 1 system as agreed by the experts, and this court must confirm that a jury must apply the same claim scope for both invalidity and infringement. There's no inconsistency here. The jury rejected the claims that they made about the Kmart system, so there is no internal inconsistency in the jury verdict. The jury rejected their claims, which then allowed them to find the way they did on infringement. You would have an argument if the jury had gone one way on one and the other on the other way, indicating some sort of inconsistent verdict, but that's not the case here at all. Well, your argument is not that the verdict was inconsistent. I agree with your statement. The finding of validity and non-infringement are not inconsistent on their face. The jury rejected their experts' claims with regard to Kmart, but nonetheless found that there was no evidence of infringement here, and your argument is, well, that's not fair. They shouldn't have been allowed to reach that conclusion because their experts' claims with regard to Kmart should have bound them over here, too, but they had lots of other evidence they introduced, Ms. Van Amburg and other people whose testimony was introduced. There were lots of documents presented on the various claim elements. Why couldn't all of those be the substantial evidence for the jury verdict? Because none of that evidence was relevant to any... None of that evidence established a distinction between the Pier 1 system and the claims as construed. Our argument is that, first of all, the experts, Mr. Baker and Ms. Bridsky, agreed... Why aren't we just... I have to say, it appears as though, or you're giving the appearance that you have a weak argument on the merits, because so far you've spent five minutes of your oral argument time trying to come up with some sort of convoluted concession slash waiver theory. I think that if you want to give the court the impression that you believe strongly in the merits of whether or not their system meets, for example, the activation limitation or the unmodified point of sale or the bank processing hub, you want to use your time wisely and get to that so that you have that opportunity to discuss the merits. On the bank processing hub limitation, the claim construction requires a computer that is maintained by a bank. It does not require a computer that is owned by a bank. The evidence put in through Mr. Baker, Alexa's expert, demonstrated how the merchant bank maintains the accused computer in the Pier 1 system. Ms. Bridsky never disputed any of that evidence or his opinion. What she testified was that there was no computer of a bank, no computer owned by a bank. That's inconsistent with the claim construction. It cannot be substantial evidence of non-infringement, and it is also inconsistent with the very same analysis that she necessarily did to conclude that the KMARC system was anticipatory. She looked at the same exact type of system, the same setup, and concluded that KMARC conclusively had a computer maintained by a bank. There's no way to distinguish the Pier 1 system and her distinction and the evidence was inconsistent with the claim construction. The same holds true for the activation amounts or activating the account arguments. In the bank processing hub computer, are you contesting the claim construction that it has to be maintained, that the computer has to be maintained by a bank? No, we are not, Your Honor. Okay, so you're not contesting the claim construction, and so at least at Red Brief page 42, referring to the appendix at 9906-10 and 10,012, they point to evidence in the way of factual testimony that Pier 1 itself or a contractor maintained the accused terminals, not a bank. And so since the construction is it has to be maintained by a bank and they have factual evidence in the record that they or their contractor maintained it, but it was never maintained by the bank, why isn't that substantial evidence for the conclusion? Because the evidence cited to was merely conclusory testimony that basically Pier 1 maintains their own computers. But the claim construction doesn't preclude finding of infringement if a bank also is involved in maintaining the computers. And Mr. Baker conclusively established the role of the bank in maintaining these computers. Ms. Britsky, their expert on this very technical subject, never disputed Mr. Baker's substantive opinion on that point. As I understood it, the Pier 1 expert explained that gift cards are treated differently than credit cards, that gift cards are not processed through the bank or maintained by a bank. Am I wrong? She admitted that the gift cards, that the computer is maintained by a bank for purposes of credit cards. And again, we get back to the claim construction. But not for gift cards. That's what she testified to, but the claim construction does not require the computer to be maintained by a bank for purposes of gift cards. If it's maintained by a bank, it meets the claim construction and this goes to a core idea of the patents, which is the But nobody was using these computers to activate prepaid cards. Wait, wait, I don't understand. So this is a claim only to an electronic gift card system. Claim 34, for example, of the 608 patent, which I understand to be representative, pertains only to gift cards. When the computer system is operating all the steps of this claim, in no means, her testimony is, in no means is it maintained by the bank. And you're saying, however, when it's performing a function completely separate and apart from the claim function, it is in that context maintained by a bank. I don't understand how that's relevant to these claims. It's the same computer, Your Honor. Whether in one moment a gift card transaction runs through it or a fraction of a second later a credit card transaction flows through it, it's the same computer and it's maintained by the bank. And the gift card system takes advantage of the same security and reliability and standards and everything else that the bank maintains for that computer. That's a core concept of the patent, is to use the same systems and security in these bank-maintained networks to activate gift cards. And so the claim construction does not say that every time a gift card transaction goes through the bank has to somehow be involved with that specific transaction. The claim construction relates to the computer and says that the computer has to be maintained by a bank and that's all it was ever intended to mean in the context of this invention. I hear you and you're making a good case, but I've got to review this verdict for substantial evidence and their experts and their fact claims are that there is a distinction and it does make a difference and the court bought it. The jury was not entitled to disregard the expert testimony on this technical point and the only expert evaluation put in by Pier 1's expert was that there's no computer maintained by a bank because Pier 1 is not a bank. Well, that's not substantial evidence that the computer is not maintained by a bank because the claim construction doesn't require the computer to be owned by a bank and that was the expert only challenge to this aspect. Isn't there a difference between having to comply with banking regulations and whether a computer is maintained by a bank? Well, as Mr. Baker established, the banks play an active role in enforcing and maintaining the computer in compliance with those standards. They do testing of the computer. They can do audits of the computer. They have enforcement powers to shut the computer down if it's not compliant. But to comply with those regulations doesn't necessarily equate to being maintained by a bank. But there was more to the evidence than that, Your Honor. Mr. Baker established the active ongoing role of the bank in physically maintaining these computers in order to ensure that they are compliant because these computers are entry The claim construction doesn't say it's only maintained by a bank. It can be a shared situation where Pier 1 maintains aspects and the bank maintains aspects. But the bank doesn't maintain aspects related to gift card processing, which is all that this claim is about. The bank, it seems to me, at least according to their expert, may participate in maintaining the computer, but only when it's utilized for credit card processing or the terminal issue. Respectfully, Your Honor, that point that Ms. Britsky made contradicts what's actually at issue here. It's the same computer. In one moment, a credit card transaction goes through. In the next moment, a gift card transaction goes through. And it's not unreasonable. The maintenance of bank accounts is not unreasonable. Do you have a testimony to that effect? I'm sorry, Your Honor? Do you have a testimony to that effect? Mr. Baker's testimony established the flow of the transactions. Ms. Britsky did not dispute. A specific testimony to the fact that the computer at the bank does the same thing for credit cards as it does for gift card transactions? Well, the testimony of Mr. Baker, which was not disputed. It wasn't quite that specific. Well, it was that the same computer is maintained by the banks. And as the patent teaches in Figure 2, the gift card system claim can be implemented by connecting through the same computers that are maintained by banks for the credit card system. And that figure shows that the computers involved in the gift cards, they're located at and they're owned by Pier 1. They're located at Pier 1. The accused bank processing hub computer is located in a data center for Pier 1. It is connected to banks. But that's not the case with credit card transactions. It's the same computer. So, respectfully, it is the same computer located at Pier 1 for credit cards. And it's the same computer that the banks maintain. But is a processing of the credit card transaction itself handled at the bank or at a retail store? Well, the processing starts at the point-of-sale device and goes all the way through the network ultimately to a processing hub. For credit cards, the bank processing hub computer sends them one way and for the accused gift cards, sends them another way to SVS. But it's the same computer that's been maintained by the banks from the very beginning of the credit card system. May I move on to the activation amount account issue? You can, but you are down to 40 seconds. I will restore your rebuttal time if you sit down now. But if you go on, it's going to be at your own peril. We only have 15 minutes. So, your choice. I'll save it for rebuttal, if I may. Probably a good choice. Thank you. Don't worry. You won't be precluded from bringing it up on rebuttal. Thanks. Mr. Fish. And if Mr. Fish needs three extra minutes, since I'm giving opposing counsel three extra minutes, why don't you go ahead and give it to him. Thanks. Thank you, Your Honor. Good morning. Your Honors, I'm joined by Mr. Bill Sigler, Mr. Jason Hoffman, and Mr. Tom Chen. May it please the Court. I'd like to begin by talking about the issue of inconsistency, which was talked about very briefly this morning. The fundamental concept with the inconsistency, the assumption that's made by Alexa here, is that, in fact, the teachings of the prior art are the same teachings of the product in suit, and they're not. And that's found in the record at A10375, where the technical expert for Pier 1, Ms. Breitsky, identifies that the two systems are not identical. It's also found with fact witnesses in this case. For example, we can compare and contrast what the architects of the Pier 1 system and what the architects of the Kmart system had to say about an important element of the way the system operates, namely how the cards are activated. So if we look at A10095, we will see the testimony of Mr. Mike Hastie, who talks specifically about how the Kmart system operates. That fact witness testified that the Kmart system is one that uses point-of-sale activation, POS activation. That's separate and apart from the way the system operated by Pier 1 functions. The architect of that, the technical witness, the fact witness that spoke to that is Mr. Mike Hastie. His testimony is found at A10026. And he testified that the Pier 1 system uses shift activation. As the record evidence in this case reflects for numerous witnesses, there are two types of activation used for gift cards, point-of-sale activation, and we know that there's also shift activation. So we see through the record evidence, not just through expert testimony, but through fact testimony as well, that the Pier 1 system and the Kmart system are different. And those differences alone take this way out of the realm of anything that could be an inconsistent verdict. Of course, the briefing we submitted, Your Honor, speaks deeply to the relationship between their inconsistency argument and the Function Media case, in particular pages 1327 to 1328 of Function Media. Even if this Court were to conclude that there is somehow a similarity between the two and that there is somehow, in fact, an inconsistency in the verdict, the time to raise that issue has long since passed. The Function Media case, as we know, applies nearly 40 years of Fifth Circuit jurisprudence to this procedural issue. Namely, that the right time to raise the issue of an inconsistent verdict is when the jury is still present before they are excused. That was not done here. Could you address the disputed claim term, activating an account? Certainly, Your Honor. Activating an account is an important claim term because one of the key issues in this case is the ability for the plaintiff to move the date of conception back in the patent to predating the Kmart system. That's an essential piece to it. The elements, there are a few, but one of the elements that's missing from all of the is the activation amount. Right now, we know in the gift card world that in some stores we can go and we can say we'll put $12.50 on a card. In others, it's pre-denominated. We see on the card it's $25, it's $50. The way this patent speaks to is an effort to try to move past the pre-denominated cards, the 50 and the 25, to sending an actual amount that's activated. That amount gets sent along with the other messages. Say, for example, the card can be put with $12.50 or $14 and change, whatever random number there is. The activating of this specific amount is one of the elements that is not present in any of the documentation relied on to try to move the date back. The way I understand it, 95% of the Pure One gift cards, they're shipped to the stores and they're active in the sense that you can use them to make balance inquiries or to return merchandise. Is that truly active in the sense of the purpose of a gift card? Can you purchase anything at that point? Your Honor, indeed, it is active. It's shipped active. It's shipped with a zero balance, which means you can perform a number of different inquiries on it. Mr. Fish, you can do a balance inquiry, but you can't make any purchases with it because there's no money on it, right? The same would be true, Your Honor, if I had $25 on a gift card and then I spent all $25 on the gift card. That gift card would still be active even though it had a zero balance after I spent tells us what activating an account means. It says under Claim 34, activating account corresponding to the electronic gift card unique identification number with a balance corresponding to the electronic gift certificate activation amount. When the card shows up with zero balance, has never been used, can you argue that that is the chosen balance corresponding to the electronic gift certificate activation amount? Your Honor, the concept there further goes on to identify the notion of making this functional for use, making the card functional for use. Yes, but the claim tells you what the use is. The claim expressly, I'm not reading from the spec, I'm reading from the very claim says it has to be activated with a balance corresponding to the electronic gift certificate activation amount. That's what it has to be activated with in order to be functional for use. The claim itself says that. This isn't an issue of interpretation. I don't think the District Court's interpretation is wrong. I just think the claim makes it clear what it has to be functional for and I'm having difficulty reconciling that with your proof that the balance inquiry can be performed and that somehow renders it activated. Well, there's more than the balance inquiry, Your Honor, that can be performed on it. For example, a return can be processed on it, which it can't be done. But again, that's not what the claim says the activation requires. The claim expressly says activating an account requires a balance corresponding to the electronic gift certificate activation amount. A refund processing is not the electronic gift certificate activation amount as clearly defined by this patent and you're not going to disagree with me on that because it would be crazy if you did. So you won't go that far. No matter how much you might like to say that's true, you will not go that far. So how do you, given that construction which the claim requires and the District Court rendered, what do you have other than balance and refunds that you can say would explain and justify this? Well, I believe those, in fact, are the functional uses, Your Honor. The key to this is the two-step versus one-step process, that making the card active for use. Well, that might be some functional uses. You know what else I could use the gift card for? Picking the lock in my basement when the children inadvertently lock it. So, right, there are lots of things that the gift card could functionally be used to do, but this claim requires a particular thing, activating an account with a balance corresponding to the electronic gift certificate activation amount. So that's the only thing that can be the kind of use that this claim term requires. Right? I mean, I don't see... I respectfully disagree, Your Honor, because I believe the claim construction added more context to this, and the idea of making it functional for use. There are a lot of different functions in the gift card world, outside of where the card can be used physically to open a door. There are actual uses inside the retail environment, inside the gift card system, for these cards that are shift active. But what do you do when the claim requires a particular use? Not any potential functional use, but a particular use. Isn't that the use? We have to focus on for the infringement inquiry. I believe, again, Your Honor, that that has been resolved through the claim construction, that the making it functional for use. There are a number of different functions that are used in a gift card system. There's the balance inquiry, there's the adding value, there is the decrementing value, there is placing a return on it. All of those things can be done at the moment the card arrives at the retailer. It doesn't have to be activated at the retailer location. That's the key to this. There is no requirement that this be activated at the retailer location. No, no. There's no requirement to be activated at the retailer location, but it seems to me the claim clearly requires, in order for it to be activated, it has to contain a balance corresponding to the electronic gift certificate activation amount. Are you saying that this claim, that under this claim element, that an account can be activated without the electronic gift certificate activation amount? The amount is zero, Your Honor. That is the amount. Can you purchase anything with a zero amount? We can agree on that, Your Honor, that it is not possible to purchase something with a zero balance. If you walk into a store with a card, it's got a zero amount, and I want to return merchandise that I purchased with another credit card, can I do that using that card? If the card is active, a balance addition can be made to it. No, that's not what I'm talking about. If it's got a zero balance, can I use that card to return merchandise that I purchased with another credit card? With a point-of-sale activated card, if that card has not been activated, nothing can be done to it. On a shipped active card with a zero balance, Your Honor, the answer to your question is yes, you can walk in and you can have the balance, you can have the value added to that card because it is active. But an inactive card doesn't have a zero balance. It doesn't have an entry in the database at all. What about the fact that this specification, when referring to activation, at least 20 separate spots, and always consistently says, for example, I'll just read randomly from column 5 at line 24. Until activated, the cards have no intrinsic value associated with them. That sentence is repeated more than 20 times throughout the spec. I highlighted it like crazy myself. I don't know why I should read the district court's, what I think is clearly correct construction, make an account functional for use as allowing for a determination of activation absent money. Until activated, the cards have no intrinsic value associated with them. Zero balance doesn't mean activation under this spec. Again, Your Honor, we're talking about the distinction between point of sale activation that the patent speaks to. Not only does it have no intrinsic value, nothing can be done with the card. Not even adding value until it is activated. Nothing can be done with it until it's activated at the point of sale. Shift activation is designed to solve that problem. It's an addition to the technology that the cards are shift active with the zero balance. Therefore, there aren't two steps required at the retailer. But you don't get to redefine what active means in the context of this patent by saying, in our implementation we define it differently. That's not a valid argument. This patent clearly defines what is required to activate under the context of these claims. The fact that you would like it to be defined differently in your system is irrelevant. You have to live with this definition because that's the way patents work. And now you have to say, is shift activation within this claim or not? And I don't know. Maybe you would be better served at this point. You've got like three minutes or two and a half minutes left. I'm moving to the other claim terms because I know you have, this is only one basis upon which you think you can prevail, right? That's correct, Your Honor. And so I want to give you a chance to jump to some of the other bases. Thank you, Your Honor. I will, if I may, continue on more with the remaining time with the component related to invalidity, if that pleases the Court. As a housekeeping matter, can I ask you, if we were to conclude non-infringement based on activation amount or unmodified point of sale or bank processing hub, do we still need to reach invalidity? Is this the kind of case that you think might be covered by Cardinal Chemical where we should reach it even if we're concluding there's non-infringement here? Or do you think that if we conclude non-infringement, we don't need to reach validity? Your Honor, I agree with you that this is a place where Cardinal Chemical and its progeny, Hill-Rom, if I could point the Court to this pinpoint citation of 1344 in the Hill-Rom case. We have a situation here, Your Honors, where there are a couple of macro and a couple of micro issues. Certainly, the defendant in this case should be free to operate as they choose with respect to this patent. The issue of infringement is a narrow one as we know from Cardinal and we know from Hill-Rom. The broader issue of validity is one that also needs to be addressed and it is found in fact in the jury verdict and that is what we're appealing from. Now, the macro issues are the fact that there are two other district court trials coming after this one through the system right now. There was a finding in the Barnes & Noble case of non-infringement. There was a finding of non-infringement in the DAP trial that happened both in June and there was a previous proceeding related to validity as well. On the same patent? Yes, ma'am. And so these issues are working its way through the system. I should note for Your Honor that one of the two patents was removed by the plaintiff in the last two trials. But the issues themselves are similar and they're coming through. And so there is a judicial efficiency, a judicial economy component that adds to even Cardinal and the Hill-Rom case itself. Okay, you've made your case for why we ought to do it, but now you have no time to tell us why we ought to do what you want. So I'm going to give you one more minute and then I'm going to be more generous to your opponent to try to tell me on the merits why we should overturn a jury finding of anticipation, which is a question of fact. Thank you, Your Honor. With the few moments I have, I would like to point this Court then to what I believe is the inflection point on this issue, page 53 of the reply brief of Alexem. Because that is where they try to address the issue of the Cordon's requirements. Cordon's tells us, the Cordon's case in particular, tells us specifically that what we need to do is have an element-by-element relationship between those documents relied on to move the date and the patent terms themselves, as well as an assessment of the claim construction. That page 53 of the reply brief by Alexem cites a grand total of two pages from the transcript. And those two pages, 10392 to 10394, are nothing more than conclusory statements. The very thing that Cordon's tells us we should not rely on when taking an important step of moving that date. If this Court believes that that date can't move, that ends the inquiry with respect to validity because, Your Honors, the parties have already agreed. The parties have already agreed. On page 27, it's found, of Alexem's opening brief, the parties have already agreed that all of the elements of the Kmart system are found in all, and find all of the elements of the claims in suit. So there isn't a factual inquiry. This is a legal issue. The jury was not given the specific information it needed to make the decision. It was given only a conclusory statement that there happens to be some prior, some technical teachings that allow the date to move backward. The key, the signal to us, also, that the Alexem brief does not have what is necessary, the second step, which is the... The problem is Mr. Dorff's testimony could have been believed by the jury, which was he invented it first. The Cordon's case, Your Honor, and here I'd like to point the Court to 1333 to 1335, says that that's really not enough. What we need is an element-by-element analysis. And that element-by-element analysis must also include the claim construction. And what Alexem points to in its reply brief, again, on page 53, this is the key page of their entire brief on this issue, more noted for the absence of evidence than the presence of evidence. They say that they believe that that was met, and they cite to the record A9614. And if we look at A9614, it is a question and answer about infringement, not validity. There's been no creation of any evidence during that trial that linked together the specific elements of those claims and the teachings that relate specifically to the issues of what relates between the claim elements... Okay, I think we've got your idea. Two minutes over, so now I have to let him have a turn and add two more minutes to his time, please, on rebuttal. Thank you, Your Honor. Thank you. Now, Mr. Fish did save a little time for rebuttal, and so if you end up addressing something that is in his cross appeal, which is validity, I'm going to give him two minutes to respond to it. So give him six minutes here. You're getting twice as much time today as you're supposed to, but it's an interesting case, and you're both doing a good job of helping the Court. So go ahead. Thank you very much, Your Honor. I'd like to start with just a quick point on this activating an account issue. Counsel made reference to doing a return and getting a credit on a card, doing a return. I just want the Court to be apprised. Those returns, those were accused transactions in this case because it's the same process. The customer can pay with cash for a gift card, or the customer can return a candle and put the credit on a gift card. So there's no distinction to be made there in saying that somehow the card was preactivated for that function. The only way to do the return is to swipe the card through the accused transaction. The unmodified existing retail point-of-sale device is the limitation I did not get to in my opening remarks. And I want to start with the claim construction. And it reads that it is a terminal for making purchases at a retail location of the type and uses of July 1097. There was no dispute as to that aspect of it. Here's the important part that was disputed, which has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system. Reprogrammed, customized, or otherwise altered with respect to software or hardware. Now, we use computers every day. And when we use computers, things change on the computer. But not every change involves reprogramming, customizing, or altering the software. And that's where their evidence of non-infringement fails on this limitation because Alexa's expert, Mr. Chang, reviewed all of the evidence that was put forth by Pier 1 and requested in discovery of any evidence of these types of reprogramming or alterizations. And he concluded as a software and point-of-sale device expert that there was no such evidence. He explained that the only true test for whether software has been altered is the source code. Pier 1's witness, Von Amburg, was responsible for producing all of the evidence that they put forth at trial to demonstrate those types of changes. And it was undisputed that there was no source code evidence that showed any change whatsoever on the point-of-sale devices. The only source code evidence showed changes not on the devices, but on a central computer in the back office of the store called the store controller. This is another area where there was no dispute. There's no dispute that there was no evidence of any source code changes, the types of changes that Pier 1's witnesses talked about. That's not true, Ms. Von Amburg testified. When you say there's no evidence of source code changes, it's true that the record doesn't contain evidence that shows the POS software did undergo a change because the only source code you seem to have is on the servers, not on the individual terminals in terms of source code. You don't have the source code going the other way showing there was no changes that were ever made to it either. That source code simply isn't in the record. But her personal factual testimony in conjunction with the experts was nonetheless that software, the POS terminal software, was in fact modified. The first point in response to the question, Your Honor, is we requested all evidence of changes. And Mr. Chang reviewed all evidence produced. And there was no evidence produced of source code changes on the devices. And we're entitled to that's very strong circumstantial evidence. Isn't the testimony of Ms. Von Amburg enough? The testimony of Ms. Von Amburg on direct, she attempted to take non-source code evidence and interpret it years later as somehow suggesting changes to the devices were made. But on cross-exam, she clearly admitted that none of those non-source code documents were specific to changes made on the terminals as opposed to changes made on the controller. The expert, Ms. Breitsky, then admitted essentially the same thing. I understand her as not admitting at all what you just said, but rather agreeing that many of the changes that you could point to were server-related changes or modifications that were unrelated to what's at issue here. But she nonetheless continued to insist that there were in fact, in response to cross-examination, changes that were made to the POS software over and over. And you never asked her, well, what were they? Tell me with specificity what were they? Because I read her entire testimony. And I feel like you didn't pin her down on what were the changes. She did, in a somewhat conclusory fashion, insist that there were some. But you didn't pin her down and find out or explore what they might have been or how they weren't. But she did testify to the types of changes that she was alluding to. And they were things like getting the printer to print the receipt for the gift card or allowing the clerk to enter a password or putting in a new, what's called an SKU, a product code. But you successfully got her on cross-examination on every one of those things. But she yet kept insisting anyway that there were other ethereal changes that were made. And you didn't nail her down on what were they. There was never a point where you got to, and that's all of them. Well, but that's – we can't – we had the source code they produced and no source code for the devices. And she conceded that every change that she said was made was not a change that was necessary for use in the card system. No, but she kept insisting, even in response. She would admit that the individual changes you point to weren't responsive. But then she nonetheless kept saying, but there were others. But she never identified what they were. And that's not reasonable evidence for the jury. Look at A40954. This is part of DX41, which she discusses in three different places in her testimony. And if you look at – if you want to get it, take a minute and get it so you have it in front of you. 40954 is the appendix site. Counselor, while you're working on that, let me ask you just a real quick question that I need to be clear on. None of the parties are disputing the claim construction in this case, correct? That's correct, Your Honor. Well, okay, how about this? I mean, it's marked confidential, but I believe the reason it's confidential has to do with the amounts and the dates and the project completion. I believe if I read this one sentence, which is not really specific to anything in particular, and I don't even reveal which project it's relevant to, that I'm likely not breaching that confidentiality. Can you tell me, before I read the sentence, if it's a very general sentence? Do you think that I'm creating a problem for either of you on the confidentiality? I think it's really more of an issue for Pier 1. It's their information, Your Honor. Okay, so do you have a problem with it? No, yes, Your Honor. Okay, so here's my question. This document says, and I'll read it to you since you can't find it, POS programming provided sales audit programmers an additional transaction test file that included an issuance, return of a gift card, balance inquiry, gift card used as a tender, and merchandise credit issued. POS programming on these issues was set back a week due to production issues. Completion of POS coding is scheduled for mid-next week. Doesn't that suggest, in support of her testimony, that there were actual modifications to the program? And even if it doesn't, in your mind, isn't it enough for substantial evidence for a jury? I mean, she's saying more stuff was done. I agree. Her testimony was conclusive. But this document kind of goes right to the heart of POS programming. I respectfully disagree, Your Honor, and it is because of the phrase POS programming. The testimony of both Ms. Omberg and Ms. Pritzke was clear that none of these documents specified any changes to the POS device versus other aspects of the system. And they used these cryptic passages like this to suggest that there were changes to the device. But Ms. von Omberg herself admitted that she was using this phrase, POS software or POS system or POS programming, to include things that may have instead happened on the controller. And the source code conclusively showed that the only changes that were made, in fact, occurred on the controller, not the devices, and the experts agreed that all of the functions required to activate these cards were standard functions of the device. Okay, I think we have your argument.  Thank you, Your Honor. Mr. Fish has a couple of minutes for rebuttal. You do realize this is exclusively limited to your cross-appeal, right? That's correct. I understand that. The validity issue in general is still an important one that needs to be addressed. And I believe, as I've said before, the Cordon's case is the one that we really have to look to first. I still didn't hear, during opposing counsel's remarks just a few moments ago, any pointing to any record evidence that suggests that the requirements of Cordon's were met during trial. Specifically, Cordon's requires that we show a specific relationship between those documents relied upon and the specific claim term elements, concluding with an incorporation of the court's claim construction itself. As I mentioned, page 53 of opposing counsel's brief, on its reply, is where they seek to address Cordon's. They don't even cite Cordon's by name, but they attempt to say that they met their obligations. They put in some evidence, and the two things they point to, as I mentioned, are a scant two pages of an entire trial transcript. We're talking about five claims over two patents with over a dozen claim construction terms. On its face, it strains credulity to believe that all of that can be achieved in two pages worth of trial testimony. But then when we go to even read the two pages of trial testimony, what we see is the magic wand being waved that says, we've done this, we've met this obligation. If this court believes that the Cordon's factors have not been met, that's the only determination it needs to make to reach a conclusion of invalidity. And that is because they are unable to move the date back behind the Kmart reference, and on page 27 and in other places of the briefing submitted initially by Alexa, we see that all parties and experts agree that the prior art system teaches the claims in suit. Thank you, Your Honors. Thank both counsel for their argument. The case is submitted. Before you depart, you can sit down, Mr. Fish. Eleven appendices volumes, are you kidding? Find a way in future cases to pare it down to only the necessary material. I don't know that I've ever had a case where I physically couldn't bring the appendix volumes to court for reference to them. The example that I wanted to point to something in the appendix, and you couldn't even find it during your entire time at argument, should give you a little hint that it was too much. At some point it becomes not helpful to the court to drown this in quite that much paper. So take it away, you both did a great job, but take it away as hopefully something maybe to be avoided in the future. Thank you.